This is an appeal by appellant, David W. Wood, from a judgment of the Franklin County Court of Common Pleas, Domestic Relations Division, granting appellee's motion for relief from judgment pursuant to Civ.R. 60(B).
On August 8, 1994, appellant-husband and appellee-wife, Carol D. Wood, entered into a decree of dissolution. On March 21, 1995, appellee filed a motion for relief from judgment pursuant to Civ.R. 60(B)(1), (3), (4) and (5), seeking to vacate the decree of dissolution. Appellant filed a memorandum contra appellee's Civ.R. 60(B) motion. The trial court subsequently dismissed appellee's Civ.R. 60(B) motion without a hearing. Appellee filed a notice of appeal from the trial court's entry dismissing the motion.
By decision rendered August 12, 1997, this court, in Wood v.Wood (Aug. 12, 1997), Franklin App. No. 97APE01-77, reversed the judgment of the trial court, holding that appellee's Civ.R. 60(B) motion alleged operative facts entitling her to an evidentiary hearing. Upon remand, the trial court conducted a hearing on the matter beginning May 20, 1998. By decision and entry filed July 21, 1998, the trial court granted appellee's Civ.R. 60(B) motion. Specifically, the court found that appellee was entitled to relief under Civ.R. 60(B)(1) (excusable neglect), Civ.R. 60(B)(3) (undue influence), and Civ.R. 60(B)(5) (failure to disclose marital assets and incompetency to contract).
In its decision granting appellee's motion for relief from judgment, the trial court made the following findings of fact. Appellant and appellee were married on April 4, 1970. One child, Ann M. Wood, was born as issue of the marriage. Appellee has a high school education and she completed one year of college. Appellant obtained both a bachelor's degree and a law degree during the course of the marriage. At the time of the dissolution, appellee was employed as an assistant manager for Ben Franklin Crafts, and earned approximately $23,000 per year. Appellant, an attorney, was employed as corporate counsel for Safelite Glass Corporation, and earned approximately $95,000 per year.
During the parties' marriage, appellant was the primary decision-maker, i.e., regarding his education, career moves and the investment of the parties' assets. Appellee was the primary caregiver for their daughter and was responsible for the housework. From 1989 until 1993, appellee was responsible for handling family financial matters such as banking and bill paying duties.
On two occasions, appellant committed acts of domestic violence against appellee. In 1973, appellant hit appellee in the stomach because she had danced with another man. In April 1994, following an argument in bed, appellant repeatedly struck appellee in the buttocks with his fist, causing a bruise and impairing her ability to walk or sit for several days. Following the 1994 incident, appellee expressed her fear of the appellant to Cynthia Preece, Judith Hurr, Clara Herr, and Debbie Sherman. Appellant also engaged in acts of verbal abuse against appellee. During one incident, after appellant discovered that appellee had consulted with an attorney about a possible divorce, appellant took papers from her and berated and ridiculed her, telling her that she was stupid and that she had been "ripped off." Appellant engaged in nine extramarital affairs during the marriage.
In the fall of 1993, appellee began experiencing mental health problems. Her symptoms included difficulty sleeping, hair loss, mood swings, despondency, feelings of helplessness and hopelessness, and a loss of interest in activities she once enjoyed. Appellee also contemplated suicide. She first sought the help of mental health professionals in December 1993. Appellant made an appointment for appellee with Interact Behavioral Services. Appellee began taking prescription anti-depressants, but her symptoms continued. Appellee also received counseling from Janice Beatty, of Crittenden Family Services, in February and April 1994.
In early 1994, appellee's work performance began to suffer as a result of her mental health problems. Her boss, Judith Hurr, indicated that when appellee was first hired she was professional, neat, thorough, eager to learn and a good employee. However, in early 1994, appellee was introverted, often crying, disheveled in her appearance, uncommunicative with other employees and she did not perform her duties on time. Appellee also began calling in sick on a frequent basis. Hurr at one point discussed with one of the store's owners the possibility of terminating appellee's employment. During this same time period, appellee actively socialized with co-workers during lunch and after work, including going to restaurants and bars, playing darts and billiards, and line dancing.
Appellee's relationship with her daughter and appellant also deteriorated during the first half of 1994. In March 1994, appellant received an anonymous telephone call from a female co-worker of appellee's, claiming that appellee was having an affair with Walter Miles, a twenty-four year old co-worker. That evening, as appellee was leaving work, appellant pulled up in his car and ordered her inside. He interrogated her and accused her of having an affair with Miles. Despite appellee's denials, appellant refused to believe her. Appellant also accused appellee of having an affair with Lou Solana, her former store manager. Appellee had previously told appellant that she was physically attracted to Solana.
Early in 1994, appellant informed appellee that he was filing for a divorce. Appellee then consulted with attorney Bill Friedman on April 7, 1994, resulting in the incident in which appellant belittled her and took the papers Friedman had provided her. During her consultation with Friedman, appellee had filled out a client interview form, and she was able to list most of the parties' assets and liabilities based on her memory.
On April 16, 1994, appellee was at Chaps Bar in Reynoldsburg with Walter Miles. Appellee and Miles decided to leave the bar so that they could talk in a quiet atmosphere. They sat in Miles' truck for forty-five minutes. When they returned to the bar, they observed appellant. Appellee ducked down in Miles' truck so that appellant could not see her. She instructed Miles to drive her to Cynthia Preece's house. Appellant telephoned Preece's house several times that evening, yelling, screaming and accusing appellee of having an affair.
When Preece drove appellee home the next morning, appellee discovered that appellant had placed her belongings in garbage bags and left them on the front porch. Appellee tried to enter the house but appellant physically prevented her from entering. Appellee sat on the porch and cried for two hours. During the time appellee sat on the porch, her daughter and appellant's parents arrived at the residence.
Preece took appellee to Harding Hospital where she was admitted. She was then transferred to Riverside Hospital and admitted for treatment of depression and suicidal ideation. Appellee was diagnosed with major depression and was released after three days. The trial court concluded that this incident, as well as other incidents with appellant, contributed to appellee's mental health problems.
When appellee was released from Riverside Hospital, appellant drove her home. She was referred to North Central Mental Health Services, and prescriptions were continued for antidepressants. Appellee was under the care of Debbie Sherman at North Central Mental Health Services. Appellee continued with her treatment with Sherman and she took her medication off and on, but saw no improvement in her condition. Appellant attended one counseling session with appellee in May 1994.
During the month of June 1994, appellee began a relationship with Doug Paine, a co-worker. Appellee moved into the guestroom in the parties' marital home, but she continued to have sexual relations with appellant. She received mixed messages from appellant, who told her that he wanted to work out their problems but also encouraged her to have sex with Paine. Appellee engaged in sexual activity with Paine on June 22, 1994; however, they ended their relationship by the middle of July 1994.
On July 3, 1994, appellant presented appellee with a draft of a separation agreement prepared for appellant by an attorney, Rick Innis. When appellee read the agreement, she noticed that appellant had already made hand-written changes to some of the terms. The parties made two additional changes to the agreement. The parties changed the payment plan for appellee's share of the equity in the marital home (termed spousal support in the separation agreement) from $1,000 a month for one year to $500 a month for two years. Appellant explained that their property was to be split, with him receiving eighty percent of the assets and appellee receiving twenty percent; appellant viewed this arrangement as fair based on their incomes and contributions during the marriage. Appellee inquired about spousal support, but appellant told her that she was not receiving such support because she had an affair. Appellant also discouraged appellee from retaining an attorney, telling her it would cost more, take longer, and that they would end up hating each other.
Appellant and appellee both initialed the changes appellant had made and then signed the separation agreement. They also signed the acknowledgement of legal representation, indicating that appellant was being represented by the firm of Innis and Baker, while appellee was unrepresented. During the events of July 3, 1994, appellee was despondent, felt that she had no future, and believed that she was totally responsible for the break up of their marriage.
On July 5, 1994, appellant and appellee met at the office of attorney Innis to sign the final documents for dissolution of the marriage. Innis incorporated appellant's hand written changes into the separation agreement, which both parties signed. Innis prepared the parties' financial disclosure affidavits based on a listing of assets and liabilities prepared by appellant. Appellee asserts that she saw only the first two pages, and not the third page listing the parties' retirement accounts. Although both parties' financial disclosure affidavits indicated that they had retirement benefits, no values were placed on those benefits in either the financial disclosure affidavits or in the separation agreement. Further, some marital assets were not disclosed in the separation agreement and certain other assets were not valued. For example, no values were placed on the parties' automobiles or their 1986 Tobago airplane in either the separation agreement or in the financial disclosure affidavits. Further, appellant's two Safelite stock options and ten shares of IBM stock did not appear in the financial disclosure affidavits, the separation agreement or in appellant's listing of the parties' assets and liabilities. Although the parties received income from rental of the airplane, which is noted on appellant's sheet containing the parties' assets and liabilities and listed on appellant's 1994 federal income tax return on line 21, this rental income did not appear on the financial disclosure affidavits or in the separation agreement.
Appellee did not discuss any of the aspects of the separation agreement with Innis; she believed there was nothing else she could do and that she had no choice but to sign the agreement. Appellee did not receive any copies of the paperwork when she left the attorney's office that day. She did, however, subsequently receive a copy of the separation agreement in the mail. On July 5, 1994, appellee felt that she had no choice in the matter, that she had to do as appellant told her, and that she had no future to be concerned about.
During the same week, appellant told appellee that he wanted her out of the house by Friday, July 8. Appellee felt that she had no choice but to look for an apartment. She began looking on July 6, and she signed a lease on July 8. Appellee moved out of the marital home and into an apartment on July 9, 1994. Appellant retained most of the furniture and the personal property in the marital home.
Appellee had second thoughts about terminating the marriage, but she did not contact an attorney about her concerns. She discussed her doubts with appellant on several occasions between the execution of the final documents on July 5 and the final hearing on August 8, 1994. Appellant told her that the only way they could reconcile was to go through with the dissolution proceeding. Appellant told her that if they did not get a dissolution and ended up going through a divorce proceeding, they would end up hating each other. Appellant's rationale was that he wanted them to start a new relationship and to put the old one behind them. He told appellee that not going forward with the dissolution was not a solution to their problems.
On July 20, 1994, appellee met with Dr. Richard Scarnati, a licensed psychiatrist at North Central Mental Health Services, who performed a psychiatric evaluation. Appellee told Dr. Scarnati that she had been experiencing depression for a year and that her life had been falling apart over the last six months. Appellee related her symptoms to Dr. Scarnati, which included poor sleep, lack of appetite, feelings of worthlessness and hopelessness, as well as a lack of interest in sex. Dr. Scarnati diagnosed appellee as suffering from "major depression recurrent" and "marital problems." Dr. Scarnati described appellee's depression as "the most severe depression you can get." He opined that her depression was the result of biological and genetic factors, and he felt that she had been experiencing depression for much more than one year.
Dr. Scarnati indicated that appellee's depression had been worsened by the situational factors in her life, including the disintegration of her marriage. He also believed that physical and sexual abuse she suffered as a child contributed to her depression and her feelings of guilt, hopelessness and worthlessness. Dr. Scarnati testified that appellee's thought process was adversely affected by her depression. Specifically, he indicated that her ability to make adequate decisions was impaired, that her insight and judgment were poor, that she had problems with concentration and that her long term and short term memory were poor. Dr. Scarnati recommended changing her anti-depressant medication to Wellbutrin, and for appellee to participate in group therapy and to continue counseling sessions with Debbie Sherman. Dr. Scarnati saw appellee again on August 24, 1994, and he noted no improvement in her condition. He doubled her prescription of Wellbutrin and advised that she continue with her counseling sessions.
On August 8, 1994, appellant and appellee appeared before the trial court for a hearing on the final dissolution. The parties signed a quit-claim deed on the marital home, as well as the decree of dissolution and an addendum. Appellee was asked by the trial court whether she wanted to go through with the dissolution and appellee responded that she did. Appellee did not express her uncertainty to the court that day; she later testified that she was in a daze on that date, and that she felt that she had to go through with the dissolution in order to reconcile with appellant.
Following the dissolution, the parties continued to see each other as if they were dating. Both parties also saw other people during this time period. Appellee had a brief relationship with David Helman, and appellant began a relationship with Melanie Davis. Appellee felt that she was in competition with Davis; she declined to compete with Davis for appellant, so she voluntarily took herself out of the competition.
On September 29, 1994, Dr. Aneglina Guanzon, a licensed psychiatrist who had taken over Dr. Scarnati's patients at the Gahanna clinic, conducted a psychiatric evaluation of appellee. Dr. Guanzon diagnosed appellee as suffering from "major depressive episode recurrent with no psychotic features." Dr. Guanzon noted the same symptoms that Dr. Scarnati had reported. Dr. Guanzon described appellee as "profoundly depressed," but the psychiatrist changed appellee's medication from Wellbutrin to Prozac, which eventually improved appellee's condition.
Dr. Scarnati, who testified at trial, and Dr. Guanzon, who gave deposition testimony, both opined that appellee was not competent to contract in early July 1994. Their opinions were based on the severity and duration of appellee's depression. Dr. Scarnati stated that there was no way appellee could have understood her rights or what she would be getting from the dissolution. Dr. Guanzon indicated that appellee was not capable of participating in the divorce transaction, understanding her rights, or acting in her own self-interest due to the degree of her depression. Both witnesses also opined that appellee was susceptible to undue influence in light of her past abuse, her feelings of guilt and worthlessness, and her inability to act in her interest.
Dr. Ronald Litvak, a licensed forensic psychiatrist, testified on behalf of the appellant. Dr. Litvak, who reviewed the depositions of Drs. Scarnati and Guanzon, indicated that these witnesses lacked adequate information to make any conclusions of a forensic psychiatric nature, especially with regard to appellee's competency. More specifically, Dr. Litvak stated that they did not have enough information about appellee's history and background for comparison to formulate any conclusions about her competency or the causes of her depression. Further, Dr. Litvak criticized Dr. Guanzon's opinion that appellee was susceptible to undue influence by stating that the psychiatrist had no basis for this conclusion. Dr. Litvak opined that, while he could determine appellee's competency to contract in early June 1994 with the proper information, he could not determine appellee's competency level based on the information that Drs. Scarnati and Guanzon utilized.
Dr. Thomas Palucci, a licensed psychiatrist, also testified that Drs. Scarnati and Guanzon lacked sufficient information to determine appellee's competency in early July 1994. Dr. Palucci's opinion was a critique of the clinical methodology of psychiatry in general as opposed to the psychological methodology based on testing. Dr. Palucci indicated that Drs. Scarnati and Guanzon did exactly what he would expect clinical psychiatrists to do and he could not say whether they were right or wrong. He also stated that the information in appellee's records reflect that she had reduced judgment in July 1994.
As previously noted, in its decision granting appellee's motion for relief from judgment, the trial court found that appellee was entitled to relief under Civ.R. 60(B)(1) for excusable neglect, Civ.R. 60(B)(3) on the basis that the agreement was the product of undue influence, and Civ.R. 60(B)(5) for appellant's failure to disclose marital assets and the value of marital assets. The court also concluded that appellee was entitled to relief under Civ.R. 60(B)(5) on the basis that appellee was incompetent to contract at the time of the execution of the separation agreement. The trial court further found that appellee had failed to show that appellant fraudulently induced her to sign the separation agreement or that the signing of the agreement was the product of coercion or distress.
On appeal, appellant sets forth the following four assignments of error for review:
ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN HOLDING THAT APPELLEE WAS ENTITLED TO RELIEF FROM JUDGMENT PURSUANT TO CIV.R. 60(B)(1)
 ASSIGNMENT OF ERROR NO. 2
 THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN HOLDING THAT APPELLEE WAS ENTITLED TO RELIEF FROM JUDGMENT PURSUANT TO CIV.R. 60(B)(3)
 ASSIGNMENT OF ERROR NO. 3
 THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN HOLDING THAT APPELLEE WAS ENTITLED TO RELIEF FROM JUDGMENT PURSUANT TO CIV.R. 60(B)(5)
 ASSIGNMENT OF ERROR NO. 4
 THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN VACATING THE ENTIRE DECREE RATHER THAN JUST THE PORTIONS OF THE DECREE AFFECTED AS OF AUGUST 8, 1994.
Appellant's four assignments of error, all dealing with the propriety of the trial court's granting of relief pursuant to Civ.R. 60(B), will be addressed together.
The requirements for prevailing on a Civ.R. 60(B) motion are set forth in paragraph two of the syllabus of GTE AutomaticElectric v. ARC Industries (1976), 47 Ohio St.2d 146, which provides:
 To prevail on a motion brought under Civ.R. 60(B), the movant must demonstrate that: (1) the party has a meritorious defense or claim to present if relief is granted; (2) the party is entitled to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5); and (3) the motion is made within a reasonable time, and, where the grounds of relief are Civ.R. 60(B)(1), (2) or (3), not more than one year after the judgment, order or proceeding was entered or taken.
The trial court, in its decision granting appellee's Civ.R. 60(B) motion, noted that, as this court found previously inWood, supra, appellee's motion stated a meritorious defense or claim to present in the event relief was granted, and that the motion was timely filed. Thus, the primary issue before the trial court at the hearing was whether appellee was entitled to relief under Civ.R. 60(B)(1), (3) and/or (5).
Appellant's first three assignments of error contend that the trial court erred as a matter of law and abused its discretion in holding that appellee was entitled to relief from judgment pursuant to Civ.R. 60(B)(1), (3) and (5). We will first address the trial court's determination that appellee was entitled to relief from judgment pursuant to Civ.R. 60(B)(3). The trial court sustained appellee's motion for relief for judgment under Civ.R. 60(B)(3) based on the court's determination that the separation agreement was the product of undue influence exerted by appellant over appellee.
In DiPietro v. DiPietro (1983), 10 Ohio App.3d 44, 47, this court held:
 While a separation agreement executed by a husband and wife pursuant to R.C. 3103.05 is generally required to be fair and equitable to the wife (who was once deemed to be the party in need of protection * * *), where the parties have dealt at arms length with each other rather than in a confidential relationship, the test is whether the agreement is the product of fraud, duress or undue influence upon the party in the weaker bargaining position.
In Ross v. Barker (1995), 101 Ohio App.3d 611, 618, the court noted that:
 * * * Undue influence has been defined as "any improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely." Marich v. Knox Cty. Dept. of Human Serv. (1989), 45 Ohio St.3d 163, 543 N.E.2d 776, quoting Black's Law Dictionary (5 Ed. 1979) 1370. It has also been described as a form of influence that would destroy the free agency of the mind and cause people to act against their will. Raymond v. Hearon (1928), 30 Ohio App. 184, 164 N.E. 644; Rich v. Quinn (1983), 13 Ohio App.3d 102, 13 OBR 119, 468 N.E.2d 365.
See, also, Rheinscheld v. McKinley (Jan. 27, 1988), Hocking App. No. 453, unreported. (Undue influence is the "unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.")
In DiPietro, supra, at 46, this court noted the elements of undue influence: "(1) a susceptible party, (2) another's opportunity to influence the susceptible party, (3) the actual or attempted imposition of improper influence, and (4) a result showing the effect of the improper influence." Under the facts of the instant case, the trial court found the presence of each of the above elements.
This court's standard of review in considering the trial court's decision to grant relief from judgment is an abuse of discretion. Doddridge v. Fitzpatrick (1978), 53 Ohio St.2d 9,12. Further, a trial court's factual determinations in ruling on a motion for relief from judgment "will not be overturned if they are supported by at least some competent and credible evidence." In the Matter of the Dissolution of the Marriage of:Wittman (Mar. 21, 1995), Franklin App. No. 94APF07-995, unreported (1995 Opinions 1103, 1107).
Upon review of the record, we conclude that the trial court did not abuse its discretion in finding that appellee was entitled to relief from judgment pursuant to Civ.R. 60(B)(3) based on a finding of undue influence. Initially, we note that the record supports the trial court's findings that appellee was a susceptible party due to her mental state and the nature of her relationship with appellant.
The evidence indicates that appellee suffered from mental health problems prior to signing the separation agreement. Appellee's condition was diagnosed as "major depression recurrent," and she was treated by means of professional counseling and antidepressant medication. Appellee began experiencing changes in her behavior during the fall of 1993, with symptoms that included mood swings, sleeplessness and feelings of despondency. Appellee's co-workers noticed these changes, and they indicated that her condition worsened over time. Appellee testified that, in November 1993, she "wanted to die." (Tr. 51.) On April 17, 1994, appellant prevented appellee from entering the marital residence based on appellant's belief that appellee was having an affair. Appellee sat on the porch and cried for two hours before a friend took her to a hospital for psychiatric care. Appellee remained overnight at Harding Hospital, and was then transferred to Riverside Hospital the next day. Appellee was treated for major depression and suicidal ideation. The trial court noted that appellee felt guilty about the demise of her marriage and her affair with Doug Paine, and she believed that she did not deserve much from the dissolution; appellee's judgment, concentration and memory were poor during this time.
The record further indicates that appellant knew of appellee's mental illness and had the opportunity to influence her. Appellant acknowledged that appellee had told him that she no longer wanted to live. While appellant testified that he did not believe appellee was suicidal, he was concerned "about her general depression." (Tr. 628.) In fact, appellant arranged for her to obtain counseling at Interact Behavioral Services
Regarding the nature of the relationship between appellee and appellant, the trial court found that appellant had been the primary decision-maker during the marriage. Further, appellant had subjected appellee to acts of physical and verbal abuse. One of the incidents of physical abuse, in which appellant struck appellee repeatedly on the buttocks, occurred approximately one month before the separation agreement was presented to appellee. Appellee expressed her fear of appellant to other individuals. She testified that, prior to her release from Riverside Methodist Hospital, she called her mother-in-law and "asked her if she would stay with us if I were to go back to the house." (Tr. 990.) Appellee's mother-in-law agreed to stay at their residence, and appellee also asked her mother-in-law to accompany her and appellant home from the hospital. According to appellee, "[I]f she had not agreed to do that, I would not have, first of all, gotten into a car alone with him, and I would not have gone back to that house alone with him." (Tr. 991.) The trial court also noted that appellant had the opportunity to influence appellee because they lived together on a daily basis until after the separation agreement was executed. Appellee testified that the appellant was "very controlling, very intimidating." (Tr. 992.) She stated that appellant "wanted to control what I did, when I did it, where I went, who I was seeing, who I was talking to. He always wanted to be in control of everything." (Tr. 992.)
On July 3, 1994, appellant presented appellee with a draft of a separation agreement prepared by appellant's attorney. Appellee did not have legal counsel during this time. The trial court noted that the draft of the agreement was presented at their home without any advance warning, with changes already made in appellant's handwriting for her to initial. Appellant acknowledged at trial that, although the document he presented to appellee on July 3 represented that appellee had been advised to retain her own attorney, appellee had not actually been advised in such a manner. The separation agreement divided the property with approximately eighty percent of the listed assets going to appellant and only twenty percent going to appellee. Appellant told appellee that the property division was "fair" based on their contributions during the marriage; appellant further told appellee that she did not deserve spousal support "because I didn't make a contribution to the marriage." (Tr. 1006.) As noted above, the facts indicate that appellant had previously berated appellee for making an appointment with a domestic relations attorney. Appellant acknowledged on cross-examination that he took physical possession of the documents that appellee brought home after her consultation with attorney Friedman, and appellant noted that he "probably" disposed of them. (Tr. 642.) Appellant also acknowledged that he had a conversation with appellee at the time he first presented her with the separation agreement on July 3, in which he indicated to her that if she retained an attorney they could end up "hating each other." At trial, appellant could not recall whether he told the attorney who drafted the separation agreement that appellee had undergone treatment for depression or that she was taking anti-depressant medication.
There was also evidence presented that appellant represented to appellee that any reconciliation could only occur after the dissolution was completed. Appellee testified that, prior to the court appearance on the decree of dissolution, she expressed her misgivings to appellant about the dissolution, but that appellant told her "we're not going to reconcile unless you go through with the dissolution." (Tr. 246.) Finally, while more fully addressed under the issue of the trial court's grant of relief under Civ.R. 60(B)(5), the record is undisputed that certain assets were not included in the separation agreement and that values were not assigned to certain assets. Upon review, the record supports the trial court's determination that "these actions by * * * [appellant] amounted to the imposition of improper influence, especially given that * * * [appellee] did not have independent representation and that * * * [appellant's] bargaining power as a licensed attorney outweighed hers."
The trial court further concluded that the resulting separation agreement indicated the effect of appellant's improper influence on appellee. Specifically, the trial court noted that appellant's share of the property was three times appellee's share. The court also noted that, under the current law of property division, appellee "would have been entitled, absent evidence to the contrary, to half of all of the marital property, regardless of the percentage of her income to the whole," and that, given the duration of the marriage, the fact appellant earned his degrees during the marriage, and appellee's mental health problems, appellee "probably would have been entitled to spousal support."
We agree with the trial court's conclusion that the terms of the separation agreement give rise to an inference that the agreement was the product of undue influence. Among the factors that may be considered in determining whether an agreement is the product of unfair persuasion are "the unfairness of the resulting bargain, the unavailability of independent advice, and the susceptibility of the person persuaded." Restatement of the Law 2d, Contracts (1979) 491, Section 177, comment b.
In the present case, the record indicates that the parties were married for more than twenty years. Appellee worked during most of the marriage, including the time period during which appellant attended law school. The agreement provided that appellee would receive "spousal support" in the amount of $500 per month for a period of twenty-four months. The trial court noted that the provision termed "spousal support" in the separation agreement was "actually payment of her share of the equity in the marital home." Under the agreement appellee transferred all of her right in the marital home to appellant (with the provision that appellant pay to appellee $5,120 "representing her interest therein"). The nature and value of appellant's retirement benefits (as well as other assets) were not disclosed to appellee. Appellant received the Togoba airplane, for which no value was assigned under either the separation agreement or financial disclosure form; nor was the rental income for this asset noted in the agreement or disclosure form. As previously noted under the trial court's facts, following the decree of dissolution, appellant's share of the assets represented over three times appellee's share. When viewed in the context of the length of the marriage, appellant's assets and his annual salary of $95,000 per year, as well as the lack of provision for any meaningful spousal support, the terms of the agreement indicate, as found by the trial court, the effect of appellant's improper influence over appellee.
In sum, the totality of the evidence shows that appellant, a licensed attorney, who knew of appellee's depression and weakened mental state, procured a separation agreement that was clearly beneficial to his own interests at the expense of the weaker party. This document was signed by appellee without the benefit of legal representation, and following appellant's efforts to discourage appellee from obtaining such representation. These circumstances, in addition to evidence that certain property was not fully disclosed or valued, and that appellant made erroneous representations to appellee regarding her right to property under the agreement, lead us to conclude that there was competent, credible evidence before the trial court to support a finding of undue influence. See,e.g., Souders v. Souders (Oct. 23, 1998), Sandusky App. No. S-98-017, unreported (appellee entitled to relief under Civ.R. 60(B) where facts show appellee entered into agreement without proper knowledge or consent, that appellant exercised undue influence over appellee and that terms of separation agreement were inequitable).
We make clear that the fact appellee was not represented by counsel is not, in and of itself, dispositive; however, as noted above, the record indicates that appellant actively attempted to discourage appellee from obtaining independent counsel, and appellee believed that she had no choice but to accept the agreement. The record also shows that certain assets were not disclosed or valued, and that when appellee went to the office of appellant's attorney on July 5, nobody discussed with appellee the ramifications of the agreement. Further, we do not deem it critical to appellee's theory of recovery that the trial court chose to accept appellee's expert testimony that she was not competent to contract in July 1994. Rather, regardless of the issue of competency to contract, it is clear from the evidence regarding appellee's history of medication and hospitalization prior to July 1994, that appellee was suffering from depression and a weakened state of mind prior to signing the agreement which made her susceptible to appellant's influence.
Accordingly, based upon the evidence presented, the trial court did not abuse its discretion in granting relief from judgment pursuant to Civ.R. 60(B)(3). Appellant's second assignment of error is overruled.
In light of our determination that the trial court did not err in granting relief from judgment under Civ.R. 60(B)(3) based upon a finding of undue influence, we need not address whether the trial court erred in granting relief from judgment on other grounds, including excusable neglect under Civ.R. 60(B)(1) based on mental incompetence. Thus, plaintiffs first assignment of error is rendered moot. Similarly, we do not reach the issue whether the court erred in granting relief pursuant to Civ.R. 60(B)(5) based on its finding that appellee was incompetent to contract.
We do note, however, given our discussion above pertaining to the lack of disclosure of the marital assets, that the record supports the trial court's determination that appellee was entitled to relief from judgment pursuant to Civ.R. 60(B)(5) on the basis that appellant failed to disclose and/or value certain assets. We further note that appellant does not challenge the trial court's finding as to this theory of relief. Regarding this issue, the trial court rendered the following conclusions of law:
 Here, * * * [appellant] acknowledged in his testimony that certain assets were not included in the separation agreement or in the Loc.R. 17 financial disclosure affidavit. Neither the ten shares of IBM stock, nor * * * [appellant's] two Safelite stock options were included in the separation agreement or the financial disclosure affidavits. * * * [Appellant's] 1994 federal income tax return indicates that he had rental income from the use of the airplane; however, no rental income is listed in the separation agreement or the financial disclosure affidavits. No values were placed on the parties' pensions, the parties' vehicles, or the 1986 Tobago airplane in either the separation agreement or the financial disclosure affidavits. The separation agreement failed to divide both parties' Wisconsin State Life Insurance policies, the two shares of Dow stock the ten shares of IBM stock, and the two Safelite stock options. Although * * * [appellee] is excused from disclosing the value of her pension due to her severe emotional problems * * *, [appellant] knew the nature and extent of the assets and was represented by counsel at the time. Consequently, this court holds that Petitioner-Wife is entitled to relief under Civ.R. 60(B)(5) for failure to disclose marital assets and the value of marital assets.
R.C. 3105.63 states in part that "[t]he separation agreement shall provide for a division of all property * * *." This court has previously held that "[a] separation agreement which does not fully disclose the property owned by the parties, both jointly and individually, is defective under the statute, and can constitute a fraud upon the court if submitted for the court's approval as representing a full and fair division of the property." Frecker v. Frecker (Mar. 6, 1984), Franklin App. No. 83AP-382, unreported (1984 Opinions 459, 462). In In reMurphy (1983), 10 Ohio App.3d 134, 137, the court addressed the issue of relief from judgment under Civ.R. 60(B)(5) where the separation agreement omits assets, holding in pertinent part:
 We hold that it is * * * mandatory that the separation agreement shall contain "a division of all property," not just property jointly owned, but all property belonging to husband and wife. The essence of the dissolution process is a meeting of minds on all factors material to the dissolution of one of the most intimate and respected relationships of our society. When the state addresses the termination of marriages, it has an interest that in our opinion is of greater intensity than its interest in the termination of many other relationships, such as those in commercial affairs. It is mandatory not only that husband and wife agree to the separation agreement but also that the separation agreement cover all points of potential controversy between them. We hold that when a separation agreement omits assets that are substantial in relative amount and material to an informed and deliberate agreement about an equitable division of the property, the statutory requirement has not been met and the ensuing decree has a fatal flaw.
Upon review of the trial court's decision, the competent, credible evidence supports the court's finding that appellant failed to disclose the existence of certain marital assets and that he failed to disclose the value of other marital assets. Accordingly, the trial court did not abuse its discretion in granting relief under Civ.R. 60(B)(5). Appellant's third assignment of error is overruled.
Finally, while appellant does not challenge the trial court's finding that certain assets were not disclosed or valued, appellant contends under the fourth assignment of error that the entire decree should not be vacated; rather, appellant asserts that appellee "received exactly what she bargained for," i.e., twenty percent of the assets that were properly disclosed, and thus, it is contended, this court should not vacate the entire decree. In light of our determination that the trial court properly granted relief from judgment under Civ.R. 60(B)(3) in setting aside the decree of dissolution on the grounds that the separation agreement was the product of undue influence, plaintiff's argument under the fourth assignment of error is rendered moot.
Based upon the foregoing, appellant's second and third assignments of error are overruled, the first and fourth assignments of error are moot, and the judgment of the trial court is hereby affirmed.
Judgment affirmed.
BOWMAN and KENNEDY, JJ., concur.